# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| **SHOEMAKER CORPORATION III, INC.,**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**M. JEROME GARRETT AND JOSHUA S. FELLMAN,**<br><br>        **Defendants,**<br><br>**and**<br><br>**M. JEROME GARRETT, JOSHUA S. FELLMAN, DAVINCI MSP, INC., AND GARRETT AND FELLMAN OPERATING, LLC,**<br><br>        **Third-Party Plaintiffs,**<br><br>**v.**<br><br>**KEVIN SHOEMAKER AND SHOEMAKER CORPORATION III, INC.,**<br><br>        **Third-Party Defendants.** | **Court No. 4:19-cv-00145-JCG-CDL** |

## OPINION AND ORDER

Before the Court are a Motion for Preliminary Injunction filed pursuant to Rule 65 by Shoemaker Corporation III, Inc. ("Plaintiff" or "Shoemaker Corporation") [Doc. 16]; Motions to Dismiss filed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) by Shoemaker Corporation and Third-Party Defendant Kevin Shoemaker ("Shoemaker") [Docs. 57, 59]; and Motions for Partial Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants and Third-Party Plaintiffs M. Jerome Garrett ("Garrett") and Joshua S. Fellman ("Fellman"), Third-Party Plaintiff DaVinci MSP, Inc. ("DaVinci"), and Third-Party Plaintiff Garrett and Fellman Operating, LLC ("GFO") [Doc. 82], and by the Shoemaker Parties [Doc. 94].

For the reasons discussed below, Plaintiff's Motion for Preliminary Injunction is denied as moot, Plaintiff's Motion to Dismiss and Shoemaker's Motion to Dismiss are denied in part and granted in part, the Garrett-Fellman Parties' Motion for Partial Summary Judgment is denied in part and granted in part, and the Shoemaker Parties' Motion for Partial Summary Judgment is denied.

**BACKGROUND**

Based on the Complaint, Amended Third-Party Complaint, and extrinsic

documents attached to these filings, the factual allegations are as follows.[1]

Plaintiff (d/b/a Technology Solutions Consulting, Inc.) is a corporation registered

in the State of Nevada and doing business in Tulsa County, Oklahoma.  Plaintiff

owns and operates businesses under various trade names, including Imminent Data

Hosting, LLC and Communications World of Tulsa (d/b/a Edge Technologies).

Shoemaker is an individual who resides in Tulsa County, Oklahoma and is the

Chief Executive Officer of Plaintiff.  The Court refers to Plaintiff and Shoemaker

collectively as the "Shoemaker Parties."

Defendants Garrett and Fellman are individuals who reside in Tulsa County,

Oklahoma and are now doing business as DaVinci and GFO.  DaVinci is a

---

[1]  Generally, the sufficiency of a complaint must rest on its contents alone, but a
district court may consider: "(1) documents that the complaint incorporates by
reference; (2) documents referred to in the complaint if the documents are central
to the plaintiff's claim and the parties do not dispute the documents' authenticity;
and (3) matters of which a court may take judicial notice."  Gee v. Pacheco, 627
F.3d 1178, 1186 (10th Cir. 2010) (internal citations and quotation marks omitted).
If a district court intends to rely on other evidence, it must convert the Rule
12(b)(6) motion into a motion for summary judgment, giving proper notice to the
parties.  See Fed. R. Civ. P. 12(d); GFF Corp. v. Associated Wholesale Grocers,
Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  The Shoemaker Parties do not contest
the authenticity of the documents attached to the Amended Third-Party Complaint,
which are central to the Garrett-Fellman Parties' counterclaims.  Therefore, the
Court may rely on these extrinsic documents when considering the motions to
dismiss.

domestic for-profit corporation registered in Oklahoma and was formerly known as Technology Solutions Consulting, Inc.  GFO is a domestic for-profit corporation registered in Oklahoma and was formerly known as Imminent Data, LLC.  The Court refers to Garrett and Fellman collectively as "Defendants," and refers to Garrett, Fellman, DaVinci, and GFO collectively as the "Garrett-Fellman Parties."

Plaintiff alleged eleven causes of action in its Complaint, including breach of an Asset Purchase and Sale Agreement ("APSA") (Count I); breach of a Restrictive Covenant Agreement (Count II); tortious interference with existing and prospective contractual relations (Count III); fraudulent inducement (Count IV); fraud/concealment (Count V); unfair competition and false designation of origin under the Lanham Act (Count VI); unfair competition, common law trademark infringement, and passing off under Oklahoma law (Count VII); civil conspiracy (Count VIII); declaratory judgment for the enforceability of the APSA and Restrictive Covenant Agreement (Count IX); constructive trust over receivables and payments allegedly belonging to Plaintiff (Count X); and accounting of all transactions and contracts entered into and payments received by Defendants (Count XI).  Compl. at 13–21.

On March 26, 2019, Plaintiff filed a Motion for Preliminary Injunction against Defendants, seeking to "enjoin Defendants, their employees, and all persons acting in concert with Defendants from competing with Plaintiff for five

years from the Closing Date of the [APSA] and from using Plaintiff's Trade

Names immediately and during the pendency of this action."  Pl.'s Mot. Prelim.

Inj. [Doc. 16]; Pl.'s Mem. Law Supp. Mot. Prelim. Inj. [Doc. 17].  Defendants

opposed the motion and Plaintiff filed a reply.  Defs.' Combined Resp. Pl.'s Mot.

Prelim. Inj. Br. Supp. [Doc. 21]; Pl.'s Reply Supp. Mot. Prelim. Inj. [Doc. 24].

On June 10, 2019, the Garrett-Fellman Parties (as Third-Party Plaintiffs)

filed an Amended Third-Party Complaint[2] against the Shoemaker Parties (as Third-

Party Defendants), alleging: breach of a Consulting Agreement Summary

(Counterclaim I); conversion (Counterclaim II); breach of guaranty (Counterclaim

III); tortious interference with existing business relationships (Counterclaim IV);

appointment of receiver and imposition of constructive trust (Counterclaims V–

VI); seeking an accounting of the books and records of Plaintiff and Shoemaker

(Counterclaim VII); and seeking damages for unjust enrichment (Counterclaim

VIII).  See First Am. Counterclaims/Third-Party Petition ("Am. Third-Party

Compl.") [Doc. 51]; Am. Third-Party Compl. at Ex. A ("Consulting Agreement

Summary") [Doc. 51-1], Ex. B ("Amended and Corrected Asset Purchase and Sale

---

[2]  The Garrett-Fellman Parties filed their initial Third-Party Complaint [Doc. 30]
on May 20, 2019, against Brand Export, LLC, Brand Export Packing of Oklahoma,
Inc., and Pryor ** First Pryority Bank, and Kevin Shoemaker.  The Amended
Third-Party Complaint now includes Shoemaker Corporation as a Third-Party
Defendant but no longer includes Brand Export, LLC, Brand Export Packing of
Oklahoma, Inc., and Pryor ** First Pryority Bank as Third-Party Defendants.

Agreement" or "APSA") [Doc. 51-2], Ex. C ("Promissory Note") [Doc. 51-3], Ex. D ("Security Agreement") [Doc. 51-4].

On August 16, 2019, the Shoemaker Parties filed their respective motions to dismiss the Amended Third-Party Complaint.  See Kevin Shoemaker's Mot. Dismiss Am. Counterclaim and Third-Party Compl. ("Shoemaker's Motion to Dismiss" or "Shoemaker's Mot.") [Doc. 57]; Kevin Shoemaker's Mem. Supp. Mot. Dismiss ("Shoemaker's Mem.") [Doc. 58]; Shoemaker Corp.'s Mot. Dismiss Am. Counterclaims and Third-Party Compl. ("Plaintiff's Motion to Dismiss" or "Pl.'s Mot.") [Doc. 59]; Shoemaker Corp.'s Mem. Supp. Mot. Dismiss ("Pl.'s Mem.") [Doc. 60].  The Garrett-Fellman Parties filed their briefs in opposition and the Shoemaker Parties filed their reply briefs.  Defs.' and Third-Party Pl.'s Resp. Pl.'s Mot. Dismiss ("Resp. Pl.'s Mot. Dismiss") [Doc. 61]; Defs.' and Third-Party Pls.' Resp. Third-Party Def.'s Mot. Dismiss ("Resp. Shoemaker's Mot. Dismiss") [Doc. 62]; Pl.'s Reply Mot. Dismiss ("Pl.'s Reply") [Doc. 63]; Third-Party Def. Kevin Shoemaker's Reply Mot. Dismiss [Doc. 64] ("Shoemaker's Reply").

On October 30, 2020, the Garrett-Fellman Parties filed a Motion for Partial Summary Judgment, moving for summary judgment on all claims (except for declaratory judgment (Count IX)) and the counterclaim of conversion (Counterclaim II).  Defs.' and Third-Party Pls.' Mot Part. Summary J. ("GFP's Mot. Part. Summary J.") [Doc. 82]; Defs.' Mem. Supp. Mot. Part. Summary J.

6

("GFP's Moving Br.") [Doc. 83]; Defs.' Statement of Uncontroverted Facts ("GFP's SUMF") [Doc. 83]; Decl. Joshua Fellman ("Fellman Decl.") [Doc. 84]; Decl. M. Jerome Garrett ("Garrett Decl.") [Doc. 85].  The Shoemaker Parties opposed the motion, and the Garrett-Fellman Parties filed their reply.  Resp. Br. Opp'n Defs. Third-Party Pls.' Mot. Part. Summary J. Pl. Third-Party Def. ("SP's Resp.") [Doc. 100]; Statement of Disputed Material Facts ("SP's SDMF") [Doc. 100]; Ex. Supp. Mot. ("SP's Ex. 13 Resp.") [Doc. 113]; Defs.' Third-Party Pls.' Reply Resp. Br. Pl. Third-Party Def. Opp'n Mot. Part. Summary J. ("GFP's Reply") [Doc. 105].

On December 30, 2020, the Shoemaker Parties moved for partial summary judgment on Counts I and II of the Complaint and Counterclaims I and III of the Amended Third-Party Complaint.  Combined Part. Mot. Summary J. Br. Supp. Pl. Third-Party Def. ("SP's Mot. Part. Summary J." or "SP's Moving Br.") [Doc. 94]; Statement of Uncontroverted Material Facts ("SP's SUMF") [Doc. 94]; Decl. Kevin Shoemaker ("Shoemaker Decl.") [Doc. 94-1].  The Garrett-Fellman Parties opposed the motion, and the Shoemaker Parties filed their reply.  Defs' Third-Party Pls.' Resp. Combined Part. Mot. Summary J. Br. Supp. Pl. Third-Party Def. ("GFP's Resp.") [Doc. 98]; Statement of Uncontroverted Facts ("GFP's SDMF") [Doc. 98]; Reply Br. Resp. Defs. Third-Party Pls.' Resp. Combined Mot. Summary J. Br. Supp. Pl. Third-Party Def. ("SP's Reply") [Doc. 106].

On February 27, 2023, this case was reassigned to the undersigned judge sitting by designation.  Min. Order [Doc. 114].  The Court held a status conference on August 24, 2023.  Min. Proceeding (Aug. 24, 2023) [Doc. 117].

## DISCUSSION

### I.    Motion for Preliminary Injunction

Plaintiff moves to "enjoin Defendants, their employees, and all persons acting in concert with Defendants from competing with Plaintiff for five years from the Closing Date of the [APSA] and from using Plaintiff's Trade Names immediately and during the pendency of this action."  Pl.'s Mot. Prelim. Inj. at 1.  Because the Closing Date was September 15, 2017, Plaintiff's requested injunctive relief expired on September 15, 2022, and the Court can no longer offer the relief requested by Plaintiff.  Therefore, Plaintiff's Motion for Preliminary Injunction is denied as moot.

### II.    Motions to Dismiss

The Shoemaker Parties move to dismiss the Amended Third-Party Complaint pursuant to Rules 12(b)(1) and 12(b)(6), and also challenge several counterclaims on the basis that they do not meet the pleading standards set forth in Rule 8(a)(2).

## A. Rule 12(b)(1): Subject Matter Jurisdiction

### 1. Legal Standard

Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take one of two forms: a facial attack or a factual attack.  Thurman v. Cnty. Comm'rs of Okla. Cnty., No. CV-17-950-M, 2018 WL 6237908, at *2 (W.D. Okla. Oct. 16, 2018); see also Pueblo of Jemez v. United States, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015).

A facial attack questions the sufficiency of the complaint's allegations, and when reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.  Thurman, 2018 WL 6237908, at *2.  A factual attack challenges the facts upon which subject matter jurisdiction depends, and the moving party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends.  Id.  When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations but instead has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts.  Id.  Review of such evidence outside the pleadings does not convert the motion into a Rule 56 motion.  Wheeler v. Hurdman, 825 F.2d 257, 259 (10th Cir. 1978).  A court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when

9

resolution of the jurisdictional question is intertwined with the merits of the case, which occurs if subject matter jurisdiction is dependent on the same statute that provides the substantive claim in the case.  Id.

The Shoemaker Parties mount a factual challenge to the Amended Third-Party Complaint under Rule 12(b)(1), arguing that the Oklahoma Limited Liability Company Act (the "Act"), or specifically, 18 Okla. Stat. Ann. § 2055.2(f), precludes GFO from maintaining this action.  Pl.'s Mem. at 3–4; Shoemaker's Mem. at 3–4.  This contention goes beyond challenging the sufficiency of the complaint, thus the Court may consider evidence outside the pleadings to resolve the dispute without converting the claim into a Rule 56 motion for summary judgment pursuant to Rule 12(b)(1).  See Wheeler, 825 F.2d 257 at 259.  Judicial notice is appropriate when the facts are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201.

### 2.  Analysis

The Shoemaker Parties argue that the Act requires a domestic limited liability company to maintain good standing at all times under the rules of statutory construction, and analogize the instant case to Vista Expl. Co. v. Mewbourne Oil Co. ("Vista Exploration"), No. CIV-10-213-C, 2010 WL 1980196 (W.D. Okla. May 17, 2010).  See Pl.'s Mem. at 3–4; Shoemaker's Mem. at 3–4; Pl.'s Reply at

10

2–3; Shoemaker's Reply at 2–3.  The Shoemaker Parties attached a copy of a certified record kept by the Oklahoma Secretary of State, and assert that it indicates that GFO's articles of organization terminated on July 9, 2019.  Pl.'s Mot. at Ex. 1 ("Secretary of State Documents") [Doc. 58-1]; Shoemaker's Mot. at Ex. 1 ("Secretary of State Documents") [Doc. 60-1].  The Garrett-Fellman Parties do not challenge the Secretary of State Documents.  See Resp. Pl.'s Mot. Dismiss; Resp. Shoemaker's Mot. Dismiss.  The Court takes judicial notice of the Secretary of State Documents as certified public records under Fed. R. Evid. 201(d).

The Act governs the formation, operation, and dissolution of Oklahoma limited liability companies.  See 18 Okla. Stat. Ann. §§ 2000 et seq.  To comply with the Act, domestic limited liability companies must file an annual certificate and fee each year with the Oklahoma Secretary of State, due on the anniversary date of filing the articles of organization or registration until the cancellation of the articles of organization or withdrawal of the registration.  Id. § 2055.2(A), (B).  Under the Act, a company "that fails to file the annual certificate and pay the annual certificate fee within sixty (60) days after the date due shall cease to be in good standing" as a company in Oklahoma.  Id. § 2055.2(D).  If this failure to file extends to three years, the company's articles of organization will be cancelled.  Id. § 2012.1(B).  A domestic limited liability company that is no longer in good standing "may not maintain any action, suit or proceeding in any court of this state

until the domestic limited liability company has been reinstated as a domestic limited liability company in good standing." Id. § 2055.2(F).

The Amended Third-Party Complaint in this case was filed on June 10, 2019. See Am. Third-Party Compl.  The Shoemaker Parties contend that GFO's articles of organization terminated on July 9, 2019 and attached a copy of a certified record kept by the Oklahoma Secretary of State, which indicates that GFO "was inactive on the 9th day of July, 2019 . . . for failure to file an annual affidavit report and is not in good standing."  Pl.'s Mot. at 4; Shoemaker's Mot. at 4; Secretary of State Documents.

The Garrett-Fellman Parties assert that GFO was in good standing on June 10, 2019 when the Amended Third-Party Complaint was filed, and admit that GFO filed its annual report after the grace period date of July 9, 2019 (sixty days after the due date of May 9, 2019), which resulted in its inactive status until reinstatement on August 22, 2019.  Resp. Pl.'s Mot. Dismiss at 2.  The Court observes that the Secretary of State Documents demonstrate that GFO was apparently in good standing on June 10, 2019 when the Amended Third-Party Complaint was filed because the sixty-day grace period was still in effect after the due date of May 9, 2019, but GFO became non-compliant and not in good standing on July 9, 2019.

12

A company not in good standing for its failure to file an annual certificate and pay the annual certificate fee may apply to the Secretary of State for reinstatement of its status of good standing with the proper procedures under § 2055.3 of the Act.  18 Okla. Stat. Ann. § 2055.3(A).  Once reinstatement becomes effective, it "relates back to and takes effect as if the domestic limited liability company had never ceased to be in good standing[.]"  Id. § 2055.3(B).  Further, "the failure of a domestic limited liability company . . . to file an annual certificate and pay an annual certificate fee or a registered agent fee to the Secretary of State shall not . . . prevent the domestic limited liability company . . . from defending any action, suit or proceeding with any court of this state."  Id. § 2055.3(C).

The Court agrees with the Garrett-Fellman Parties that Vista Exploration is distinguishable from the instant matter.  In Vista Exploration, the court held that Vista Exploration, a domestic limited liability company, was not a legal entity permitted to bring suit in any Oklahoma court at the time it filed its petition against the defendants because its articles of organization were cancelled prior to the filing of its petition.  Vista Exploration, 2010 WL 1980196, at *2.  Unlike Vista Exploration, GFO was in good standing at the time that the Garrett-Fellman Parties filed their Amended Third-Party Complaint on June 10, 2019, fell out of good standing after it filed its Amended Third-Party Complaint, and was reinstated to

13

active status on August 22, 2019.  Resp. Pl.'s Mot. Dismiss at 2; Resp.

Shoemaker's Mot. Dismiss at 2.  Because GFO corrected its status approximately

six weeks after it fell out of good standing when it was reinstated to active status

on August 22, 2019, before the three-year deadline for the cancellation of a

company's articles of incorporation, GFO's articles of organization were not

canceled pursuant to § 2012.1.

     The Court concludes that because GFO was in good standing when the

Amended Third-Party Complaint was filed initially on June 10, 2019, GFO was

reinstated to active status approximately six weeks after it fell out of good standing

during the pendency of the litigation, and such reinstatement was retroactive to

May 9, 2019 pursuant to § 2055.3(B) as if the domestic limited liability company

had never ceased to be in good standing, GFO is not precluded from bringing this

suit.  The short lapse in GFO's status of good standing under these particular facts

does not affect its ability to maintain a suit under § 2055.2(F).  Thus, Plaintiff's

Motion to Dismiss and Shoemaker's Motion to Dismiss pursuant to Rule 12(b)(1)

are denied.

### B.  Rule 12(b)(6): Failure to State a Claim

     Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to

state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The

Court "accept[s] as true all well-pleaded factual allegations in the complaint and

view[s] them in the light most favorable to the plaintiff." Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d 1231, 1235 (10th Cir. 2013). To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 663; Twombly, 550 U.S. at 555–56. While a pleading need not include detailed factual allegations, "bare legal conclusions in a complaint are not entitled to the assumption of truth" and must be supported by factual allegations to state a claim for relief. Iqbal, 556 U.S. at 679; see also Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief").

As noted above, the Court relies on the extrinsic documents filed with the Amended Third-Party Complaint because they are central to the Garrett-Fellman Parties' counterclaims and the Shoemaker Parties do not contest the authenticity of these documents.

### 1.  Rule 8(a) Pleading Standard

The Shoemaker Parties contend that the following counterclaims fail the pleading standard to bring a motion to dismiss because they are "broadly lumped

together allegations against 'Plaintiff and Shoemaker' or 'Shoemaker and Plaintiff'

collectively" and fail to distinguish between the conduct of Plaintiff and

Shoemaker: breach of the Consulting Agreement Summary (Counterclaim I),

conversion (Counterclaim II), tortious interference with existing business

relationships (Counterclaim IV), accounting (Counterclaim VII), and unjust

enrichment (Counterclaim VIII).  Shoemaker's Mem. at 9–11; Pl.'s Mem. at 9–11.

The Shoemaker Parties argue that because the Garrett-Fellman Parties sued more

than one person or entity, the Amended Third-Party Complaint needs to allege the

basis of each contested counterclaim against each Plaintiff and Shoemaker, citing

to Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210 (10th Cir. 2011), and

Lillard v. Stockton, 267 F. Supp. 2d 1081 (N.D. Okla. 2003).  Id.

While the nature and specificity of the allegations required to state a

plausible claim varies based on context, the instant case does not involve an issue

in which a heightened pleading standard is warranted, compared to an otherwise

liberal pleading standard under Rule 8(a).  See Kansas Penn Gaming, 656 F.3d at

1215 (addressing the heightened pleading standard for equal protection claims,

specifically class-of-one claims, due to complexity of claims against multiple

defendants); Lillard, 267 F. Supp. 2d at 1117 (addressing the heightened pleading

standard for breach of fiduciary duty claims in securities cases).  A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw a

reasonable inference that the defendant is liable for the misconduct alleged, where more than a sheer possibility that a defendant has acted unlawfully is required.  See Iqbal, 556 U.S. at 678.  As discussed in more detail below, because the Garrett-Fellman Parties have satisfied the minimal Iqbal standard for pleading facially plausible claims, the Court denies Plaintiff's and Shoemaker's motions to dismiss the Garrett-Fellman Parties' counterclaims on the basis that they fail to meet the pleading requirement under Rule 8(a).

### 2.  Breach of Consulting Agreement Summary (Counterclaim I)

Garrett and Fellman bring Counterclaim I against both Plaintiff and Shoemaker alleging a breach of the Consulting Agreement Summary, contending that the Shoemaker Parties "(i) fail[ed] to provide Fellman and Garrett with a copy of year-end financial statements used to calculate Fellman's and Garrett's respective compensation, (ii) refus[ed] and/or fail[ed] to remit timely payment to Fellman and Garrett for their annual consulting fee, and (iii) refus[ed] and/or fail[ed] to remit timely payment to Fellman and Garrett for any finder's fee associated with Fellman's or Garrett's initiation, acceptance, and execution of new contracts or new services to existing clients of DaVinci under the Consulting Agreement Summary."  Am. Third-Party Compl. ¶ 37.

Because Counterclaim I is brought against both Plaintiff and Shoemaker, the Court must first address whether Plaintiff was a contracting party to the Consulting

17

Agreement Summary, which stated that it was to be "executed simultaneous to the [APSA] between Kevin Shoemaker (or an entity controlled by him), ("Buyer")[,] and Jerome Garrett and Josh Fellman, Technology Solutions Consulting and associated entities, ("Sellers/Consultants") on or before September 29, 2017." See Consulting Agreement Summary.  The Consulting Agreement Summary was signed by Buyer/Client Shoemaker on June 21, 2017, and Seller/Consultant Garrett and Seller/Consultant Fellman on June 19, 2017.  Id.

Plaintiff argues that the phrase "or an entity controlled by him" is disjunctive and restricts its application to either Shoemaker or Plaintiff, that Plaintiff and Shoemaker cannot both be parties under the Consulting Agreement Summary, and that Plaintiff's non-party status is apparent from the face of the Consulting Agreement Summary.  Pl.'s Mem. at 8–9; Pl.'s Reply at 3–4.  The Garrett-Fellman Parties contend that Plaintiff is improperly asking the Court on a motion to dismiss to decide which party was bound by the Consulting Agreement Summary.  The Garrett-Fellman Parties assert that the issue of whether Shoemaker bound himself personally or Plaintiff collectively is a dispositive issue more appropriate for a motion for summary judgment rather than a motion to dismiss.  Resp. Pl.'s Mot. Dismiss at 3.

The Court reviews the Amended Third-Party Complaint and the extrinsic documents to determine whether sufficient facts to allege a claim were presented.

Based on the Amended Third-Party Complaint and the Consulting Agreement Summary, the Court concludes that the Garrett-Fellman Parties have met the minimal Iqbal pleading standard that allows the Court to draw a reasonable inference that both Plaintiff and Shoemaker were plausibly capable contracting parties to the Consulting Agreement Summary, either Shoemaker in his individual capacity or Plaintiff, as the Buyer/entity owned by Shoemaker, and the Court denies the motions to dismiss Counterclaim I.  The Court defers the decision as to whether the Consulting Agreement Summary is an enforceable contract until the motions for summary judgment.

### 3.  Conversion (Counterclaim II)

DaVinci and GFO bring a claim of conversion against Plaintiff and Shoemaker in Counterclaim II, alleging that they took possession of and converted DaVinci's accounts receivable from the Excluded Assets and GFO's lease payments, which were assets that were excluded from the sale and have not been returned, reimbursed, or issued payment for.  See Am. Third-Party Compl. ¶¶ 41–46.

Under common law, conversion is defined as "any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with [the individual's] rights therein."  Wagoner v. Bennett, 1991 OK 70, ¶ 24, 814 P.2d 476, 481 (citations omitted).  The general rule in Oklahoma is that only

tangible personal property may be the subject of a conversion action.  Welty v. Martinaire of Okla., Inc., 1994 OK 10, 867 P.2d 1273.  When the property to be recovered is money, which is considered intangible personal property, there is no conversion.  Shebester v. Triple Crown Insurers, 1992 OK 20, ¶ 15, 826 P.2d 603, 608.

The Excluded Assets in the APSA included prior contracts and agreements owned by DaVinci and accounts receivable of DaVinci, which were due and owing prior to the Closing Date.  Am. Third-Party Compl. ¶ 69.  DaVinci and GFO allege that Plaintiff and Shoemaker failed to return, reimburse, or issue payments for accounts receivable from the Excluded Assets to DaVinci and lease payments to GFO.  Because DaVinci and GFO are seeking to recover only monetary damages, the Court concludes that they have not stated a claim for conversion under Oklahoma law.  Therefore, the Court dismisses Counterclaim II because it fails to plead sufficient facts to state a claim.

### 4.  Breach of Guaranty (Counterclaim III)

DaVinci brings a claim of breach of guaranty against Shoemaker, alleging that Shoemaker personally guaranteed the Promissory Note through the execution of the APSA in his individual capacity, and as a result is liable for Plaintiff's default of the Promissory Note and breach of the Security Agreement.  See Am. Third-Party Compl. ¶¶ 48–65.

While the alleged facts do not indicate the existence of an express guaranty agreement, the Garrett-Fellman Parties argue that Shoemaker demonstrated his intent to be bound by a personal guaranty of the Promissory Note by executing the APSA in his individual capacity and through the language in the APSA.  Resp. Pl.'s Mot. Dismiss at 7–8.  The Shoemaker Parties contend that in addition to the Amended Third-Party Complaint's failure to plausibly allege the existence of a guaranty agreement separate from the APSA, Shoemaker's execution of the APSA in his individual capacity is not tantamount to a personal guarantee of the Promissory Note because a contemplated guaranty agreement was to be executed separate and apart from the APSA.  Pl.'s Reply at 4–5.

The Amended Third-Party Complaint alleges that Plaintiff is in default under the Security Agreement by failing to notify DaVinci of any movement or relocation of the Collateral, and this default under the Security Agreement triggered the declaration of all liabilities secured to be immediately due and payable, which included the Promissory Note as a liability.  Am. Third-Party Compl. ¶¶ 57–58.  Plaintiff allegedly defaulted on the Promissory Note by "(i) refusing and/or failing to provide financial statements (including profit and loss statements and balance sheets) to DaVinci each calendar quarter beginning April 15, 2018, (ii) refusing and/or failing to permit DaVinci the right to audit Plaintiff's financial statements on an annual basis at DaVinci's expense, and (iii) changing senior management of

Plaintiff during the term of the [Promissory] Note, which consisted of hiring Robert Sutton in the position of Chief Operations Officer and thereafter firing Jerrel Daniel Keith." Id. ¶ 60. Considering that the Court must take as true the Garrett-Fellman Parties' allegations that Plaintiff defaulted on the Promissory Note and breached the Security Agreement, the Court concludes that the Garrett-Fellman Parties have pled sufficient facts to state a claim, and the Court denies Plaintiff's and Shoemaker's motions to dismiss Counterclaim III.

### 5. Tortious Interference with Existing Business Relationships (Counterclaim IV)

DaVinci and GFO allege in Counterclaim IV that Plaintiff and Shoemaker tortiously interfered with their previous client relationships and as a result, prevented DaVinci and GFO from collecting on their prior accounts receivable and leases, or other indebtedness due and owing and not sold through the APSA. Am. Third-Party Compl. ¶¶ 66–77.

To assert a claim for tortious interference with an existing contract or business relationship, a plaintiff must allege: "(1) a business or contractual right that was interfered with, (2) interference that was malicious and wrongful and was neither justified, privileged nor excusable, and (3) damage caused by interference." Optima Oil & Gas Co., LLC v. Mewbourne Oil Co., No. CIV-09-145-C, 2009 WL 1773198, at *8 (W.D. Okla. June 22, 2009) (citing Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1093 (10th Cir. 2006)). Such interference must

encompass "an unfair or unlawful act or by lawful means without justification." Boyle Servs., Inc. v. Dewberry Design Grp., Inc., 2001 OK CIV APP 63, ¶ 6, 24 P.3d 878, 880; see also Tuffy's, Inc. v. City of Okla. City, 2009 OK 4, ¶ 22, 212 P.3d 1158, 1167 ("[T]he elements of tortious interference with a business relationship require a showing of bad faith.").  "Malice" in this context is "an unreasonable and wrongful act done intentionally, without just cause or excuse." Tuffy's, Inc., 2009 OK ¶ 14, 212 P.3d at 1167.

DaVinci (previously doing business as Technology Solutions Consulting, Inc.) and GFO (previously doing business as Imminent Data, LLC) had business relationships with previous customers that were included in the APSA.  DaVinci and GFO allege that Plaintiff and Shoemaker had instructed such previous customers to stop communicating with and issuing payments to DaVinci and GFO after the Closing Date.  Even taking these allegations as true, the Court observes that no evidence plausibly suggests that these relationships were existing when the Shoemaker Parties interfered because those customers were no longer existing customers for DaVinci and GFO, or that Plaintiff's or Shoemaker's conduct satisfied the intent required for malice.  After the execution of the APSA on the Closing Date, the customers that were referenced in the sale no longer belonged to DaVinci or GFO.  No allegations suggest that there was malicious intent behind

these actions.  Therefore, the Court concludes that Counterclaim IV fails to allege plausible facts to state a claim and the Court dismisses Counterclaim IV.

### 6.  Appointment of Receiver and Imposition of Constructive Trust (Counterclaim V)

Fellman, Garrett, DaVinci, and GFO request the appointment of a receiver and the imposition of a constructive trust for Shoemaker's alleged breaches of guaranty and the Consulting Agreement Summary, as well as the claim for tortious interference with existing business relations.  Am. Third-Party Compl. ¶¶ 78–79.

A district court may appoint a receiver "to take the control, custody[,] or management of property . . . involved in litigation, to preserve the property, and to receive the rents, issues[,] and profits thereof pending the ultimate determination of such litigation."  United States v. Solco I, LLC, 962 F.3d 1244, 1246 (10th Cir. 2020) (citation omitted).  While a court's decision to appoint a receiver is within its discretion, the appointment of a receiver is nevertheless "a harsh remedy [that] should not be done except in the case of substantial necessity."  Skirvin v. Coyle, 1939 OK 249, ¶ 23, 94 P.2d 234, 237; see also Mitchell v. Murphy, 1935 OK 361, ¶ 9, 43 P.2d 424, 426.  Ordinarily, a receiver will not be appointed unless the plaintiff makes a substantial showing that he has rights that will be or may be jeopardized unless a receiver is appointed.  Skirvin, 1939 OK ¶ 23, 94 P.2d at 237. Appointing a receiver before a trial, much less a hearing on the merits, is an even harsher remedy, requiring plaintiffs to demonstrate clearly the exceptions to the

general rule (*i.e.*, that receivers should not be appointed on an *ex parte* basis).  See Scott v. Price, 1924 OK 878, ¶ 5, 229 P. 618, 620 (quotation omitted).

Among the facts that must be proven clearly to justify the appointment of a receiver are: (1) imminent danger that unless a receiver is appointed, the property or its proceeds will be deteriorated in value or wasted during the pendency of the suit; (2) the plaintiff will suffer irreparable loss, but if the defendant is solvent and abundantly able to respond to any such loss, or if he will provide a bond, the loss can rarely be irreparable; and (3) a strong probability that the plaintiff will ultimately prevail on the merits on the pleadings and preliminary proofs.  Truett v. Freedom Leaf, LLC, 2021 OK CIV APP 26, ¶ 11, 495 P.3d 153, 159–60 (citations omitted).

After construing the alleged facts and drawing all reasonable inferences in favor of the non-moving Garrett-Fellman Parties, the Court concludes that there is no imminent danger that the alleged compensation owed to the Garrett-Fellman Parties would be deteriorated in value or wasted during the pendency of this suit unless a receiver is appointed, or that the Garrett-Fellman Parties will suffer irreparable loss.  As noted above, the Court concludes that the Amended Third-Party Complaint did not sufficiently plead a claim for tortious interference with existing business relations.  In addition, all other factors weigh against the

appointment of a receiver due to its nature of being an extraordinary remedy.

Therefore, the Court dismisses Counterclaim V.

### 7. Appointment of Receiver and Imposition of Constructive Trust (Counterclaim VI)

Fellman, Garrett, and GFO request the appointment of a receiver and the imposition of a constructive trust against Plaintiff for claims for breaches of the Promissory Note, Security Agreement, and Consulting Agreement Summary, as well as the claim for tortious interference with existing business relations. Am. Third-Party Compl. ¶¶ 80–81.

After reviewing the factors considered to justify the appointment of a receiver, Truett, 2021 OK CIV APP ¶ 11, 495 P.3d at 159–60 (citations omitted), and construing the alleged facts and drawing all reasonable inferences in favor of the non-movant Garrett-Fellman Parties, the Court concludes that there is no evidence of imminent danger that unless a receiver is appointed, the alleged compensation owed to Fellman, Garrett, and GFO would be deteriorated in value or wasted during the pendency of this suit, nor will Fellman, Garrett, and GFO suffer irreparable loss. As noted above, the Court concludes that the Amended Third-Party Complaint did not sufficiently plead a claim for tortious interference with existing business relations, and all other factors weigh against the appointment of a receiver due to its nature of being an extraordinary remedy. Therefore, the Court dismisses Counterclaim VI.

## 8.  Accounting (Counterclaim VII)

The Garrett-Fellman Parties allege that they "cannot ascertain the amounts wrongfully converted, withheld, or acquired by Shoemaker and Plaintiff as described herein without a full accounting of all transactions and contracts entered into and all payments received since the Closing Date" and are entitled to and demand an accounting by Shoemaker and Plaintiff of all accounts or acquired by them or any person or entity in active concert or participation through any means, relating to accounts receivable and payable due.  Am. Third-Party Compl. ¶¶ 82–83.  The Garrett-Fellman Parties request that the Court order an impartial and disinterested accounting of the books and records of Shoemaker and Plaintiff to determine the compensation owed.  Id. ¶ 84.  Because the claim for accounting (Counterclaim VII) is a direct derivative of the claim for conversion (Counterclaim II), which the Court has found to be not plausible on its face, the Court dismisses Counterclaim VII.

## 9.  Unjust Enrichment (Counterclaim VIII)

Fellman and Garrett bring a claim of unjust enrichment against Plaintiff and Shoemaker for allegedly charging various business expenses to the credit cards of DaVinci, GFO, and Garrett and failing to reimburse Fellman or Garrett for the credit card charges.  Am. Third-Party Compl. ¶¶ 85–90.

Unjust enrichment arises "from the failure of a party to make restitution in circumstances where it is inequitable," or one party holds property "that, in equity and good conscience, it should not be allowed to retain." Harvell v. Goodyear Tire and Rubber Co., 2006 OK 24, ¶ 18, 164 P.3d 1028, 1035. "One is not unjustly enriched, however, by retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution." McBride v. Bridges, 1950 OK 25, ¶ 8, 215 P.2d 830, 833. Furthermore, a party is not entitled to pursue a claim for unjust enrichment when it has an adequate remedy at law for breach of contract. Krug v. Helmerich & Payne, Inc., 2015 OK 74, ¶ 6, 362 P.3d 205, 209.

There is no adequate remedy for breach of contract on these alleged facts. Construing the facts in favor of the non-movant Garrett-Fellman Parties, the Court concludes that Counterclaim VIII sufficiently pleads a claim for unjust enrichment. It is alleged that the Shoemaker Parties used the credit cards of DaVinci, GFO, and Garrett without authorization or subject to any provision in the APSA, and the Shoemaker Parties' failure to return the amount used on these credit cards raises a plausible claim for unjust enrichment. Therefore, the Court denies Plaintiff's and Shoemaker's motions to dismiss Counterclaim VIII.

Accordingly, the Court grants in part and denies in part Plaintiff's Motion to Dismiss and Shoemaker's Motion to Dismiss. The Court dismisses the following

counterclaims: conversion (Counterclaim II), tortious interference with existing business relationships (Counterclaim IV), appointment of receiver and imposition of constructive trust (Counterclaims V–VI), and accounting (Counterclaim VII).

### III.   Motions for Partial Summary Judgment

The Garrett-Fellman Parties move for summary judgment on all Counts (except Count IX) on the basis that there are no admissible witnesses or evidence to support each of these claims, and argue that there are no material facts in genuine dispute.  See GFP's Mot. Part. Summary J.  They also move for summary judgment on Counterclaim II, but this claim is dismissed pursuant to Rule 12(b)(6) as discussed earlier.  The Shoemaker Parties move for summary judgment on Counts I and II and Counterclaims I and III.  See SP's Mot. Part. Summary J.[3]

### A. Legal Standard

Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

---

[3]  Some extrinsic documents that were relied on by the Court for considering the motions to dismiss were filed again by the Parties with their motions for partial summary judgment.  See Fellman Decl. at Ex. 1 ("Consulting Agreement Summary") [Doc. 84]; Fellman Decl. at Ex. 2 ("[APSA]") [Doc. 84]; SP's Moving Br. at Ex. 2 ("[APSA]") [Doc. 94-2]; SP's Moving Br. at Ex. 3 ("Consulting Agreement Summary") [Doc. 94-3].

(1986).  A dispute as to a material fact is "genuine" if the evidence is such that "a

reasonable jury could return a verdict for the nonmoving party."  See id.  The

moving party bears the initial burden of demonstrating the absence of a genuine

issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### B. Undisputed Facts

The Court finds that the following facts are undisputed:

Plaintiff is a Managed Services Provider in the information technology

("IT") services industry providing a variety of IT services, including managed

services, consulting services, hardware services, and leased voice-over internet

protocol "VOIP" phone systems.  SP's SUMF ¶¶ 1–2; GFP's SDMF ¶¶ 1–2.

Shoemaker is the Chief Executive Officer of Shoemaker Corporation.  SP's SUMF

¶ 28; GFP's SDMF ¶ 28.

On or about June 19, 2017,[4] Shoemaker and Defendants executed a

Consulting Agreement Summary, with the "general understanding" of their

intention "to execute a Consulting Agreement for Garrett and Fellman

simultaneous to the [APSA]" for a three-year term.  SP's SUMF ¶¶ 6–9; GFP's

SDMF ¶¶ 6–9; GFP's SUMF ¶ 1; SP's SDMF ¶ 1.  A Consulting Agreement was

---

[4]  The Parties provide different dates for execution of the Consulting Agreement
Summary because Shoemaker signed on June 21, 2017, while Garrett and Fellman
signed on June 19, 2017.

never entered into as contemplated by the Consulting Agreement Summary.  SP's SUMF ¶¶ 6–9; GFP's SDMF ¶¶ 6–9.

On September 15, 2017 (the "Closing Date"), Plaintiff and Defendants entered into an Amended and Corrected Asset Purchase and Sale Agreement (the "APSA"), whereby Plaintiff purchased certain business assets of "Technology Solutions Consulting, Inc., Imminent Data Hosting, LLC, and Communications World of Tulsa, Inc. d/b/a Edge Technologies [("the Businesses")], and all similarities and derivatives thereof in connection with its continued operation" from Defendants for the sum of $3,440,000.00.  SP's SUMF ¶ 3; GFP's SDMF ¶ 3; GFP's SUMF ¶ 2; SP's SDMF ¶ 2.  Defendants transferred to Plaintiff the exclusive rights to use the business names with its continued operation of the Business under Section 1(d) of the APSA.  SP's SUMF ¶ 15; GFP's SDMF ¶ 15. The APSA was executed by Technology Solutions Consulting, Inc., Garrett, and Fellman as the Seller, and by Plaintiff and Shoemaker as the Buyers.  See SP's SUMF ¶ 5; GFP's SDMF ¶ 5.[5]  The APSA was drafted by Garrett's and Fellman's agent, Business Transitions LLC.  SP's SUMF ¶ 4; GFP's SDMF ¶ 4.

On the Closing Date, consistent with Section 5(b) of the APSA, Plaintiff executed a Promissory Note payable to Technology Solutions Consulting, Inc. in

---

[5]  The Garrett-Fellman Parties dispute this fact only to the extent that they state that Garrett, Fellman, and Shoemaker executed the APSA in their individual capacities.

the amount of $900,000.00 and paid $2,540,760.00 by wire transfer to Defendants' escrow agent.  SP's SUMF ¶¶ 10–11; GFP's SDMF ¶¶ 10–11.

On the Closing Date, DaVinci executed a Standby Creditor's Agreement in which it agreed "[t]o take no action to enforce claims against [Plaintiff] on the Standby Loan until [First Pryority Bank's] Loan is satisfied" and "[t]o take no action against [Plaintiff's] collateral, without written consent from [First Pryority Bank], until [First Pryority Bank's] Loan is satisfied" on the Closing Date.  SP's SUMF ¶ 12; GFP's SDMF ¶ 12.

One month after the Closing Date, Shoemaker emailed his staff to advise that Fellman and Garrett "are still owners" of Technology Solutions Consulting, Inc.  See GFP's SUMF ¶¶ 9, 35; SP's SDMF ¶¶ 9, 35.[6]  An ex-employee of Technology Solutions Consulting, Inc., on behalf of Plaintiff, advised the staff that customers are to be told "nothing about the transition" and that "all the customer needs to know is that we are very busy and are growing" and "if they for some reason keep asking questions have them or offer to have Josh or Jerome talk to them."  GFP's SUMF ¶ 36; SP's SDMF ¶ 36.

---

[6]  The Shoemaker Parties contend that "Shoemaker's statement that Defendants both remained a part of the corporation was made in reference to the $900,000 Promissory Note, which Shoemaker believed gave Defendants an interest in ensuring the success of the new ownership."  SP's SDMF ¶ 9.

After the Closing Date, Shoemaker continued to send invoices under the acquired trade names.  GFP's SUMF ¶ 13; SP's SDMF ¶ 13.  At no point did Plaintiff communicate to Defendants that they could use Plaintiff's trade names for the purpose of collecting accounts receivable or otherwise.[7]  SP's SUMF ¶ 29; GFP's SDMF ¶ 29.

From September through December 2017, Defendants, through M3J LLC, invoiced Winches, Inc. using Plaintiff's business address.  SP's SUMF ¶ 22; GFP's SDMF ¶ 22.  On December 21, 2017, Shoemaker sent Garrett an email directing Defendants to "[p]lease hold collection efforts."  SP's SUMF ¶ 28; GFP's SDMF ¶ 28.  Beginning in January 2018, Defendants invoiced Winches, Inc. through M3J LLC, using Garrett's home address.  SP's SUMF ¶ 22; GFP's SDMF ¶ 22.

On January 28, 2018 at 9:37 p.m., at Plaintiff's request, Garrett provided Plaintiff with the Accounts Receivable Aging Detail for Technology Solutions Consulting Inc., which he created on January 28, 2018 at 9:35 p.m. and which

---

[7]  The Garrett-Fellman Parties do not dispute this fact, "except for the erroneous implication that collection of accounts receivable was unknown to Plaintiff, or actionable."  GFP's SDMF ¶ 29.  They allege that "Shoemaker admitted that Fellman and Garrett were authorized to perform work on behalf of Shoemaker [Corporation] for 90 days after closing;" "Plaintiff's internal emails reveal that Plaintiff's staff was instructed not to tell customers of the transition to Shoemaker [Corporation] and to refer any questions regarding the transition to Fellman and Garrett;" and "Shoemaker further admitted that he did not find additional invoices to customers that were competitive with Plaintiff."  Id.

contained entries for the Invoices to Oklahoma Royal Homes with modified dates

of August 31, 2017 (pre-Closing) and the following modified invoice numbers:

Invoice #9980 in the amount of $859.99, Invoice #9979 in the amount of

$1,154.00, and Invoice #9978 in the amount of $2,326.07.  SP's SUMF ¶ 26;

GFP's SDMF ¶ 26.  Defendants were involved in the operation of M3J LLC.  <u>See</u>

SP's SUMF ¶¶ 21–22; GFP's SDMF ¶¶ 21–22.  Garrett was responsible for the

accounting associated with the invoices M3J LLC sent to Winches, Inc., while

Fellman had oversight authority over the actions Garrett took on behalf of M3J

LLC.  SP's SUMF ¶ 21; GFP's SDMF ¶ 21.

### 1. Sections 1 and 2 of the APSA: Sale and Exclusion of Assets

Under Section 1, the following were included in the sale of business:

Personal Property described on Schedule A-Assets to the [APSA]; Inventory as

described on Schedule A-Assets to the [APSA]; Real Property as described in the

[APSA]; Trade Names as described in the [APSA]; goodwill associated with the

Business; and the covenant not to compete, as described in Section 7 of the

[APSA].  SP's SUMF ¶ 16; GFP's SDMF ¶ 16; GFP's SUMF ¶ 6; SP's SDMF ¶ 6.

Under Section 2 of the APSA, assets excluded from the sale included "cash

and cash equivalents, securities, bank deposits, prepaid expenses, accounts

receivable and other items up to and including the day of Closing and more fully

defined and included on Schedule A-3-Excluded Assets[.]" ("Excluded Assets").

34

SP's SUMF ¶ 17; GFP's SDMF ¶ 17; GFP's SUMF ¶ 7; SP's SDMF ¶ 7.  The

transfer of any leases to Plaintiff by Imminent Data, LLC[8] was not included.

GFP's SUMF ¶ 33; SP's SDMF ¶ 33.

### 2. Section 6 of the APSA: Consulting and Training

Section 6 contemplated the entry of a consulting agreement by the parties for

a one-year term, but such agreement was never entered into as contemplated by the

APSA.  SP's SUMF ¶¶ 6–9; GFP's SDMF ¶¶ 6–9.

### 3. Section 7 of the APSA: Restrictive Covenant Agreement

Pursuant to Section 7 of the APSA, Plaintiff and Defendants entered into a

Restrictive Covenant Agreement on the Closing Date.  SP's SUMF ¶ 9; GFP's

SDMF ¶ 9.  The amount of $200,000.00 was allocated to the Restrictive Covenant

Agreement from the execution of a Promissory Note by Plaintiff consistent with

the terms of Section 5(b) of the APSA, which provided that Shoemaker would

execute a personal guarantee of the promissory note.  SP's SUMF ¶¶ 10–11, 13;

GFP's SDMF ¶¶ 10–11, 13; GFP's SUMF ¶ 3; SP's SDMF ¶ 3.  The Promissory

Note was payable to Technology Solutions Consulting, Inc. in the amount of

$900,000.00 and Plaintiff paid $2,540,760.00 by wire transfer to Defendants'

---

[8]  Imminent Data Hosting, LLC (sold through the APSA) and Imminent Hosting, LLC (excluded from the APSA) are different entities.  It is disputed as to whether "Imminent Data Hosting, LLC is a disregarded entity and any income attributable to Imminent Data Hosting, LLC passed through to Imminent Data, LLC."  GFP's SUMF ¶ 34; SP's SDMF ¶ 34.

Escrow Agent on the date of Closing.  SP's SUMF ¶¶ 10–11; GFP's SDMF ¶¶ 10–11.

Under the Restrictive Covenant Agreement, Defendants "agree[d] not to engage in any business in competition with the Business in any location as a sole proprietor, partner, associate, employee, or as a stockholder, officer or director of any corporation or organization so engaged, or lend [Defendant's] name to any business organization competitive with the Business within Tulsa County and all contiguous counties (the "Restricted Area"), for a period beginning from the Closing Date, as set out in the [APSA], and continuing for a period for five years (the "Restricted Period")."  SP's SUMF ¶ 9; GFP's SDMF ¶ 9; GFP's SUMF ¶ 4; SP's SDMF ¶ 4.

### 4. Section 13 of the APSA: Seller's Warranties and Representations

Section 8 listed as one of the conditions precedent to be satisfied on or prior to the Closing Date as "All the Seller's warranties and representations contained in this Agreement, shall be true as of the time of Closing," "and in the event any condition is not so satisfied, the Buyer and Seller, in their sole discretion, may terminate this Agreement without any liability to either party (to the extent noncompliance is not waived in writing by the Buyer) and all monies or consideration paid to date by Buyer shall be returned."  See SP's SUMF ¶ 18;

GFP's SDMF ¶ 18.  Defendants warranted and represented the following relevant

provisions in Section 13:

> (d) The Seller has no notice or knowledge of any business liabilities or
> obligations of any nature, whether absolute, accrued, contingent or
> otherwise, except as set forth and described herein. . . .
>
> (f) The Seller has no knowledge of any developments or threatened
> developments of a nature that would be materially adverse to said
> business.
>
> (g) The statements made and information given by the Seller to the
> Buyer concerning said Business, and upon which the Buyer has relied
> in agreeing to purchase said Business, are true and correct and no
> material fact has been withheld from the Buyer. . . .
>
> (k) There are no facts indicating that any customer(s) intend to cease
> doing business with the Seller or to materially alter the amount of the
> business currently being done with the Seller.
>
> (o) Seller hereby warrants that any and all licenses and certificates
> necessary to continue the operation of the Business as in the past shall
> be current and valid as of the closing date and can be renewed at no
> expense to Buyer other than the normal license fees.

SP's SUMF ¶ 19; GFP's SDMF ¶ 19.  The information provided to Plaintiff prior

to the Closing Date regarding customer contracts was accurate as of the date in

July 2017 that it was provided.  GFP's SUMF ¶ 31; SP's SDMF ¶ 31.  The

financial information reflected on Imminent Data, LLC's tax returns was accurate,

true, and correct at the time such information was provided to Shoemaker.[9]  GFP's

SUMF ¶ 34; SP's SDMF ¶ 34.

### C. Admissibility of Evidence

The Garrett-Fellman Parties contend that because Plaintiff has not adduced

any admissible evidence or produced any witnesses to support its claims during

discovery, which closed on September 28, 2020, there are no material facts in

genuine dispute, and they are entitled to partial summary judgment.  GFP's

Moving Br. at 10.  "To determine whether genuine issues of material fact make a

jury trial necessary, a court necessarily may consider only the evidence that would

be available to the jury."  Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d

1193, 1199 (10th Cir. 2006); see also Gross v. Burggraf Constr. Co., 53 F.3d 1531,

1541 (10th Cir. 1995) ("It is well settled in this circuit that we can consider only

admissible evidence in reviewing . . . summary judgment.").  However, this does

not mean that summary judgment evidence must be submitted in a form that would

be admissible at trial, Trevizo v. Adams, 455 F.3d 1155, 1160 (10th Cir. 2006)

(quoting Celotex, 477 U.S. at 324), because the Parties may submit affidavits, for

example, despite the fact that affidavits are often inadmissible at trial as hearsay,

on the theory that the evidence may ultimately be presented at trial in an

---

[9]  Plaintiff and Shoemaker do not take a position as to the accuracy of Defendants'
accounting, and thus, for purposes of their response to the Garrett-Fellman Parties'
Statement of Undisputed Facts, do not dispute this fact.  SP's SDMF ¶ 34.

admissible form.  Argo, 452 F.3d at 1199.  Nonetheless, "the content or substance of the evidence must be admissible."  Id. (quoting Thomas v. IBM, 48 F.3d 478, 485 (10th Cir. 1995)).  "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."  Brown v. Perez, 835 F.3d 1223, 1232 (10th Cir. 2016), as amended on reh'g (Nov. 8, 2016) (citations omitted).

### D. Breaches of the APSA, Restrictive Covenant Agreement, Consulting Agreement Summary, and Guaranty

Counts I and II and Counterclaims I and II involve claims for breach of contract.  "A breach of contract is a material failure of performance of a duty arising under or imposed by agreement."  Bennett v. Allstate Life Ins. Co., 623 F. Supp. 3d 1236, 1248 (W.D. Okla. 2022) (citing Lewis v. Farmers Ins. Co., 1983 OK 100, ¶ 5, 681 P.2d 67, 69).  To establish a breach of contract, a plaintiff must show: (1) the formation of a contract; (2) breach of the contract; and (3) damages as a result of the breach.  Cates v. Integris Health, Inc., 2018 OK 9, ¶ 4, 412 P.3d 98, 103.

In Oklahoma, there is a presumption in favor of joint and several liability when those who unite in a promise "receive some benefit from the consideration."  F.D.I.C. v. Frates, 44 F. Supp. 2d 1176, 1227 (N.D. Okla. 1999) (citing 15 Okla. Stat. Ann. § 175); see also 15 Okla. Stat. Ann. § 176 ("A promise made in the singular number, but executed by several persons, is presumed to be joint and

several.").  It is undisputed that the APSA is a valid contract that was entered into

and executed by Defendants as the Seller, and by Plaintiff and Shoemaker as the

Buyers.  See SP's SUMF ¶ 5; GFP's SDMF ¶ 5.  The Court concludes, therefore,

that Defendants are jointly and severally liable for claims stemming from the

APSA brought by the Shoemaker Parties.

### 1.  Breach of the APSA (Count I)

Count I alleges that "Defendants materially breached the [ASPA] by, inter

alia, diverting Accounts Receivable that properly belonged to Plaintiff, by not

transferring all Accounts Receivable after the Closing Date, by operating under

trade names belonging to Plaintiff, and [by] breaching the aforementioned

warranties."  Compl. ¶ 86.  Count I pertains to violations of several sections of the

APSA, specifically Section 11 and Sections 13(d), 13(f), and 13(g).

First, Count I alleges that Defendants violated Section 13(g) by making

materially false representations to Plaintiff, which Plaintiff relied on in agreeing to

purchase the Businesses regarding the Customer Contracts, stating that

Defendants: (1) included certain Customer Contracts in the [Accounts Receivable

Aging Detail] but intentionally excluded these same Customer Contracts from the

Assumed Contracts; (2) intentionally included various Customer Contracts in the

Assumed Contracts schedule of the [APSA] that were in reality terminated prior to

the Closing Date; (3) included multiple customer leases for backup disaster

recovery servers (the "BDR Server Leases") in the Assumed Contracts that were in reality terminated prior to the Closing Date and/or never existed; (4) fraudulently induced Plaintiff to agree to the APSA by providing Plaintiff with tax returns and income statements for both Imminent Data Hosting LLC and Imminent Data, LLC as a means to determine the approximate income generated by the Businesses; and (5) continued to operate and collect payments from various customers of Imminent Data, LLC, including but not limited to Micahtek, Inc. and DVIS.  Compl. ¶¶ 58–71.

It is undisputed that on January 28, 2018 at 9:37 p.m., at Plaintiff's request, Garrett provided Plaintiff with the Accounts Receivable Aging Detail for Technology Solutions Consulting Inc., which he created on January 28, 2018 at 9:35 p.m. and contained entries for the Invoices to Oklahoma Royal Homes with modified dates of August 31, 2017 (pre-Closing) and the following modified invoice numbers: Invoice #9980 in the amount of $859.99, Invoice #9979 in the amount of $1,154.00, and Invoice #9978 in the amount of $2,326.07.  SP's SUMF ¶ 26; GFP's SDMF ¶ 26.  Oklahoma Royal Homes was not included in the Assumed Contracts in the APSA.  See SP's Moving Br. at Ex. 2 ("Amended and Corrected Asset Purchase Sale Agreement") [Doc. 94-2].  This evidence presents a material fact in genuine dispute as to whether Defendants included Oklahoma Royal Homes in the Accounts Receivable Aging Detail, but intentionally excluded

it from the Assumed Contracts.  It is also disputed whether Imminent Data, LLC,

an entity that Defendants operate, is distinct from Imminent Data Hosting.  See

GFP's SUMF ¶ 34; SP's SDMF ¶ 34.  Thus, summary judgment is not appropriate

as to Defendants' alleged violation of Section 13(g) due to the existence of genuine

issues of material fact.

Second, Count I alleges that Defendants violated Section 13(d) because they

had notice and/or knowledge of multiple business liabilities or obligations that they

failed to disclose through these actions: (1) Defendants failed to disclose to

Plaintiff prior to the Closing Date the financial obligation owed by the Businesses

to at least one independent contractor, Donald R. Den Daas ("Mr. Den Daas"), who

terminated his business engagement with the Businesses as a direct result of

Defendants' failure to properly compensate him; and (2) Defendants sold various

units of hardware to customers of the Businesses prior to the Closing Date (the

"Hardware"), directed customers to purchase applicable licenses as part of their

Hardware purchases (the "License(s)"), but never actually purchased the Licenses,

installed the Licenses, and/or installed incorrect versions of the Licenses needed to

properly operate the Hardware, and as a result, left the Businesses susceptible to

licensing audits by various software and/or hardware providers, causing Plaintiff to

spend approximately $46,987.00 in order to provide the proper Licenses that were

purchased by customers prior to the Closing.  Compl. ¶¶ 48–57.

The Garrett-Fellman Parties argue that Plaintiff does not have admissible evidence for these claims, relying only on hearsay, and that the declaration of Mr. Den Daas is entirely contrary to Plaintiff's allegations about Mr. Den Daas' reason for terminating his business engagement.  GFP's SDMF ¶ 30; see GFP's Moving Br. at Ex. E ("Declaration of Donald R. Den Daas") [Doc. 83].

The Garrett-Fellman Parties also assert that Plaintiff does not have admissible evidence regarding the claims about the Hardware because Plaintiff lacks customer witnesses on its witness and exhibit list, Plaintiff never inquired about the status of the Licenses prior to the filing of the Complaint, and Defendants did not fail to purchase Licenses and/or install the Licenses for customers.  GFP's SDMF ¶ 31.  Because there are material facts in genuine dispute over whether Mr. Den Daas' termination of the business relationship was due to a lack of compensation and whether Defendants purchased the Licenses, summary judgment is not appropriate as to Defendants' alleged violation of Section 13(d).

Third, Count I alleges violations of Sections 13(d) and (f), stating that Defendants had extensive knowledge of facts indicating that customers intended to cease doing business with Defendants, and/or knowledge of developments that were materially adverse to the Businesses, as indicated by: (1) Defendants' failure to provide basic requested services to various customers, such as updating software and security systems; (2) Defendants' failure to meet minimum best practices and

standards maintained in the information technology industry; (3) the termination of relationships with the Businesses by customers under the Assumed Contracts shortly after the Closing Date due to Defendants' mismanagement and/or poor quality of services provided before the Closing Date; and (4) Defendants' knowledge of their failure to adhere to basic standards in the information technology industry, and that such practices would lead to multiple customers terminating their relationship with the Businesses.  Compl. ¶¶ 72–82.

The Garrett-Fellman Parties contend that there are no witnesses or evidence to support the allegation that these customers terminated their relationship with Plaintiff shortly after the Closing Date due to Defendants' mismanagement or poor quality of services provided before the Closing Date.  GFP's SUMF ¶ 37.  The Shoemaker Parties filed evidence of several confidential emails, which present material facts in genuine dispute over Defendants' knowledge of facts regarding the intention of customers to cease doing business with Defendants, and/or Defendants' knowledge of developments that were materially adverse to the Businesses.  See SP's SDMF ¶ 37.  Thus, summary judgment is not appropriate as to Defendants' alleged violations of Sections 13(d) and 13(f).

Fourth, Count I alleges a violation of Section 11 because "Defendants operated and/or continue to operate under the trade names Technology Solutions Consulting, Imminent Data Hosting, and/or Communications World of Tulsa d/b/a

Edge Technologies, or under various derivatives of said names" and represented to several of Plaintiff's vendors and customers that they were authorized to do business on behalf of the Businesses, through actions such as opening a credit line and issuing fraudulent invoices. See Compl. ¶¶ 17–34.

The Garrett-Fellman Parties contend that there is no witness testimony to support Plaintiff's allegations that Defendants continued to operate under these trade names. GFP's Moving Br. at 13–14. The Shoemaker Parties filed several confidential documents, however, that raise genuine issues of material fact regarding the disputed trade names, such as whether Defendants operated under the trade names and represented on behalf of vendors and customers that they were authorized to do business on behalf of Plaintiff's Businesses. See SP's Resp. at 20–21. It is also disputed whether Imminent Data, LLC, an entity that Defendants operate, is distinct from Imminent Data Hosting. See GFP's SUMF ¶ 34; SP's SDMF ¶ 34. Thus, summary judgment is not appropriate as to Defendants' alleged violation of Section 11.

Accordingly, summary judgment is not appropriate on Count I because there are material facts in genuine dispute as to whether Defendants violated Sections 11, 13(d), 13(f), and 13(g) of the APSA. The Court denies the Shoemaker Parties' Motion for Partial Summary Judgment and the Garrett-Fellman Parties' Motion for Partial Summary Judgment as to Count I.

## 2. Breach of Restrictive Covenant Agreement (Count II)

Count II alleges that "Defendants have breached their contractual duties contemplated in the Restrictive Covenant Agreement by competing against Plaintiff's Businesses within the Restricted Area and within the Restricted Period." Compl. ¶ 91. Count II asserts that Defendants breached Section I(A) of the Restrictive Covenant Agreement by operating three businesses, M3J, LLC, TSC II, and Inspired Spaces, LLC, that were allegedly in direct competition with Plaintiff. Id. ¶¶ 39–46.

It is undisputed that the Parties entered into a Restrictive Covenant Agreement. SP's SUMF ¶ 9; GFP's SDMF ¶ 9. It is disputed, however, as to whether the businesses operated by Defendants were engaged in direct competition with Technology Solutions Consulting, Inc. (or Plaintiff as Shoemaker Corporation). Plaintiff leases voice-over internet protocol "VOIP" phone systems to customers and provides a variety of IT services, including managed services, consulting services, and hardware services. SP's SUMF ¶¶ 1–2; GFP's SDMF ¶¶ 1–2. The Parties do not dispute that Inspired Spaces, LLC does not provide the same and/or substantially similar services as Plaintiff, GFP's SUMF ¶ 22; SP's SDMF ¶ 22, but disagree over whether M3J, LLC and TSC II provided the same and/or similar services in the restricted area within the restricted period of five years. See GFP's SUMF ¶¶ 19–20; SP's SDMF ¶¶ 19–20.

46

The Garrett-Fellman Parties argue that there is no admissible evidence to support the allegation that M3J, LLC competed with Plaintiff because invoices are not evidence of competition and Plaintiff has not offered any witness testimony, relying only on hearsay.  GFP's SDMF ¶ 20.  It is undisputed that Defendants invoiced leased phone systems to Winches, Inc., in Broken Arrow, Oklahoma from September through December 2017 through M3J, LLC using Plaintiff's business address, and that beginning in January 2018, Defendants invoiced Winches, Inc. using Garrett's home address.  SP's SUMF ¶¶ 21–22; GFP's SDMF ¶¶ 21–22; see SP's Moving Br. at Ex. 18 ("M3J LLC Invoices") [Doc. 100-21].  Regarding TSC II, Plaintiff provided an invoice from August 6, 2018 indicating the sale of a "Switch" (*i.e.*, IT/computer network hardware) and labor to install and configure the hardware.  SP's SDMF ¶ 20; see SP's Moving Br. at Ex. 19 ("TSC II Invoice to Carrefour Associates, LLC") [Doc. 100-22].

Because genuine issues of material fact remain as to whether M3J, LLC and TSC II provide the same and/or substantially similar services as Plaintiff, the Court denies the Shoemaker Parties' and the Garrett-Fellman Parties' motions for partial summary judgment as to Count II.

### 3. Breach of Consulting Agreement Summary (Counterclaim I)

Counterclaim I alleges that the Shoemaker Parties refused to provide Defendants with a copy of year-end financial statements used to calculate

Defendants' respective compensation, and failed or refused to remit timely payment to Defendants for their annual consulting fee and for any finder's fee associated with Defendants' initiation, acceptance, and execution of new contracts or new services to existing clients of DaVinci.  See Am. Third-Party Compl. ¶ 37.

The Court must first decide whether Shoemaker, by executing the Consulting Agreement Summary, bound only himself individually, or whether his signature also bound Plaintiff collectively, or in other words, which parties were bound by the Consulting Agreement Summary, regardless of its enforceability. The primary goal of contract interpretation is to determine and give effect to the intention of the parties at the time the contract was made.  Bank of the Wichitas v. Ledford, 2006 OK 73, ¶ 20, 151 P.3d 103, 111.  A contract's language is to be read "in its plain and ordinary meaning, but a contract's individual terms must not be read in isolation, since a contract and its various provisions must be read as a whole."  Trillium, Transp. Fuels, LLC v. Integral Energy, LLC, No. CIV-20-1197-PRW, 2023 WL 3611419, at *2 (W.D. Okla. May 23, 2023) (citations omitted).  A court must interpret a contract to give effect to the intent of the parties at the time the contract was formed, considering the contract as a whole so as to give effect to all its provisions, without narrowly concentrating upon some clause or language taken out of context.  First Enter. Bank v. Be-Graphic, Inc., 2006 OK CIV APP 141, 149 P.3d 1064.  The Shoemaker Parties argue that the phrase "or an

entity controlled by him" is disjunctive and restricts its application to either Shoemaker or Plaintiff, contending that Plaintiff and Shoemaker cannot both be parties under the Consulting Agreement Summary, while the Garrett-Fellman Parties assert that the language supports a reading that binds both Shoemaker and Plaintiff.  See SP's Moving Br. at 22.  There is a genuine issue of material fact as to the Parties' intentions at the time they entered into the contract.

Second, the Court must determine whether there is a meeting of the minds for the terms of the Consulting Agreement Summary to be an enforceable contract. The Shoemaker Parties argue that because the conditions of the term period and compensation were not carried over into the APSA, the Consulting Agreement Summary was incomplete and unenforceable, and the parties did not agree to the essential terms.  Id. at 19–22.  The Garrett-Fellman Parties contend that the Consulting Agreement Summary's contemplation of the execution of a subsequent agreement (the APSA) does not affect its enforceability because the Consulting Agreement Summary demonstrated mutual assent and contained essential terms.  GFP's Resp. at 18–23.  Genuine issues of material fact exist as to the agreed upon terms of the contract.  The Court concludes that summary judgment is not appropriate on this claim and denies summary judgment as to Counterclaim I.

### 4.  Breach of Guaranty (Counterclaim III)

DaVinci brings a claim of breach of guaranty against Shoemaker as a result of Plaintiff's breach of the Security Agreement and Promissory Note.  See Am. Third-Party Compl. ¶¶ 48–65.

A guaranty is a promise to answer for the debt, default, or miscarriage of another person.  Lum v. Lee Way Motor Freight, Inc., 1987 OK 112, ¶¶ 13–14, 757 P.2d 810, 814–15.  A guarantor has a collateral obligation that is independently and separately enforceable from that of the principal debtor or obligor, and a guarantor is secondarily liable with his obligation conditioned upon default by the principal debtor or obligor.  Id. (citations omitted).

It is undisputed that Shoemaker never executed a personal guarantee as contemplated by the APSA, but it is disputed as to the underlying reason.  SP's SUMF ¶ 14; GFP's SDMF ¶ 14.  The Shoemaker Parties state that Defendants and DaVinci never presented Shoemaker with a personal guarantee during the relevant time contemplated in the litigation, while the Garrett-Fellman Parties state that they had requested that Shoemaker execute a personal guarantee but never received a response from him.  Id.  Without an express guaranty agreement between Shoemaker and Defendants, it is possible that the Parties may have entered into a contract implied-in-fact or a contract implied-in-law.  See Shebester, 1992 OK ¶ 17, 826 P.2d at 610 (stating that an action can lie for a breach of duties *ex*

*contractu* (or "from a contract") regardless of whether the duty arose from a contract that was implied-in-law, implied-in-fact, or express); <u>see also</u> 15 Okla. Stat. Ann. § 131.  The relevant question is whether Shoemaker intended to guarantee the debts of Plaintiff when Plaintiff executed the APSA, which contained a provision indicating that Shoemaker will personally guarantee the Promissory Note.  On the Closing Date, both the Promissory Note and Security Agreement were executed by Plaintiff as the listed debtor (signed by Kevin Shoemaker as President) and DaVinci as the listed lender.  <u>See</u> Promissory Note; Security Agreement.

Oklahoma recognizes that implied-in-law contracts (or "quasi-contracts" or "constructive contracts") are mere legal fictions when the intention of the parties is disregarded, and an implied-in-law contract is "imposed in order to adapt the case to a given remedy." <u>T & S Inv. Co. v. Coury</u>, 1979 OK 53, ¶ 5, 593 P.2d 503, 504–05 (citation omitted).  A breach of an implied-in-law contract, otherwise known as a claim for unjust enrichment, arises "from the failure of a party to make restitution in circumstances where it is inequitable," or one party holds property "that, in equity and good conscience, it should not be allowed to retain." <u>Harvell v. Goodyear Tire & Rubber Co.</u>, 2006 OK 24, ¶ 18, 164 P.3d 1028, 1035.  For an implied-in-fact contract, the intention of the parties "is ascertained and enforced" and "the contract is a fact legitimately inferred." <u>Emergency Servs. of</u>

Okla., PC v. United HealthCare Ins. Co., No. CIV-19-00430-JD, 2022 WL
20509275, at *4 (W.D. Okla. Mar. 2, 2022) (citation omitted).  An agreement
implied-in-fact is "founded upon a meeting of minds, which, although not
embodied in an express contract, is inferred, as a fact, from conduct of the parties
showing, in the light of the surrounding circumstances, their tacit understanding,"
whereas an agreement implied-in-law is a "fiction of law where a promise is
imputed to perform a legal duty, as to repay money obtained by fraud or
duress."  Hercules, Inc. v. United States, 516 U.S. 417, 423–24 (quotations and
citations omitted).

The Court concludes that it is undisputed that there was an agreement
implied-in-fact for Shoemaker to personally guarantee the Promissory Note, based
on the language of the APSA, Promissory Note, and Security Agreement.  Based
on the language of these documents, it can be inferred that the sale of the assets
from Defendants to Plaintiff was based on Shoemaker's personal guarantee of
$900,000.00, almost one-third of the sale price of Defendants' assets to Plaintiff.
See SP's SUMF ¶ 13; GFP's SDMF ¶ 13.  Section 5(b)'s contemplation of a
personal guarantee was expressly written in the APSA, and when viewed together
with the Promissory Note and Security Agreement, the Court concludes that the
Parties intended to have Shoemaker personally guarantee the Promissory Note.

It is disputed, however, whether Plaintiff defaulted on the Promissory Note. See Am. Third-Party Compl. ¶ 60.  Summary judgment on Counterclaim III is not appropriate because there are material facts in genuine dispute, and the Court denies the Shoemaker Parties' Motion for Partial Summary Judgment as to Counterclaim III.

### E.  Tortious Interference with Existing and Prospective Contractual Relations (Count III)

Count III alleges that Defendants' actions as alleged in Counts I and II were undertaken with the intent and purpose of interfering with Plaintiff's existing and prospective contractual relationships with customers.  See Compl. ¶¶ 94–98.

To assert a claim for tortious interference with an existing contract or business relationship, a plaintiff must allege: "(1) a business or contractual right that was interfered with, (2) interference that was malicious and wrongful and was neither justified, privileged nor excusable, and (3) damage caused by interference." Champagne Metals, 458 F.3d at 1093.  To assert a claim for tortious interference with a prospective business advantage, a plaintiff must plead: "(1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) an intentional interference including or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted."  Cohlmia v. St. John Med. Ctr., 693 F.3d 1269, 1286–87 (10th Cir. 2012) (citation omitted).  For both

claims, "[t]he interference must encompass an unfair or unlawful act or by lawful means without justification."  Boyle, 2001 OK CIV APP ¶ 6, 24 P.3d at 880; see also Tuffy's, Inc., 2009 OK ¶ 22, 212 P.3d at 1167 ("[T]he elements of tortious interference with a business relationship require a showing of bad faith").

The Garrett-Fellman Parties argue that (1) Plaintiff's claim for tortious interference with an existing contract or business relationship fails because Plaintiff cannot demonstrate a *prima facie* case and has failed to identify any witness who will testify that Defendants' conduct precipitated the breach of a contract by a third party; (2) Plaintiff's claim for tortious interference with a prospective business advantage fails because Plaintiff has not identified a third-party witness and has no evidence that Defendants' conduct intentionally caused a breach of contract or termination of a relationship resulting in damage to Plaintiff; and (3) Count III fails as a matter of law because Plaintiff's claims in Counts I and II overlap and lack admissible evidence.  GFP's Moving Br. at 15–16.  The Shoemaker Parties did not provide a response on this Count in its opposition brief. See SP's Resp.  Because there are material facts in genuine dispute concerning Counts I and II, summary judgment on Count III is not appropriate, and the Court denies the Garrett-Fellman Parties' Motion for Partial Summary Judgment as to Count III.

## F.  Fraudulent Inducement (Count IV)

Count IV alleges that Defendants made numerous false statements and/or representations to Plaintiff prior to entering the APSA, including but not limited to Defendants representing the value of the Business to be significantly higher than what Plaintiff received.  Compl. ¶ 100.

A claim for fraudulent inducement includes "all the elements of common law fraud."  Oak Tree Partners, LLC v. Williams, 2020 OK CIV APP 5, ¶ 87, 458 P.3d 626, 646.  "These are: (1) a material misrepresentation; (2) known to be false at the time made; (3) made with specific intent that a party would rely on it; and (4) reliance and resulting damage."  Id. (citation omitted).  To constitute actual or common law fraud, there must be an intentional deception.  Sutton v. David Stanley Chevrolet, Inc., 2020 OK 87, ¶ 10, 475 P.3d 847, 853 (citation omitted).

Under Oklahoma law, to assert both a claim for fraud and a claim for breach of contract, the claims must be distinct.  See Brown v. Elephant Talk Commc'ns Corp., No. CIV-18-00902-PRW, 2020 WL 7220793, at *8 (W.D. Okla. Dec. 7, 2020); McKnight v. Marathon Oil Co., No. CIV-17-00264-R, 2017 WL 1628981, at *2 (W.D. Okla. May 1, 2017).  To determine whether a fraud claim is sufficiently distinct from a breach of contract claim, the Court considers whether the facts supporting each claim and the damages arising as a result of each claim

are different.  Brown v. Elephant Talk Commc'ns Corp., 2020 WL 7220793, at *8.

Count IV alleges the following specific false statements and representations by Defendants: (1) providing Plaintiff with tax returns and income statements for both Imminent Data Hosting LLC and Imminent Data, LLC as a means to determine the approximate income generated by the Businesses; (2) including Customer Contracts in the Accounts Receivable that were later excluded from the Assumed Contracts; (3) including various Customer Contracts in the Assumed Contracts that were in reality terminated prior to the Closing Date; and (4) including multiple customer leases for backup disaster recovery servers in the Assumed Contracts, which were terminated prior to the Closing Date and/or never existed.  Compl. ¶ 101.  Count IV also alleges that Defendants continued to collect payments from various customers of Imminent Data, LLC, including but not limited to Micahtek, Inc. and DVIS.  Id. ¶ 102.

The Court finds that the facts alleged in Count IV are not sufficiently distinct from the facts alleged in support of Count I, a claim for breach of the APSA. These two Counts are based on the same or substantially similar facts and seek the same damages.  Because Plaintiff's fraudulent inducement claim is in essence a repeat of its breach of the APSA claim, the Court grants summary judgment in

favor of the Garrett-Fellman Parties and dismisses Count IV as not sufficiently distinct from the breach of contract claim.

### G. Fraud/Concealment (Count V)

Count V alleges that Defendants intentionally failed to disclose that they were intercepting payments for Accounts Receivable owed to Plaintiff and issuing fraudulent invoices under the name Technology Solutions Consulting, Inc. to Plaintiff's customers to divert payments properly owed and belonging to Plaintiff. Compl. ¶¶ 108–18.

The Garrett-Fellman Parties move for summary judgment on Count V, arguing that the claim of fraudulent concealment is not actionable because it can only be raised as a response to a statute of limitations defense under Oklahoma law. GFP's Moving Br. at 20. The Shoemaker Parties contend that Count V is a claim for actual fraud and not asserted for the purpose of tolling a statute of limitations. SP's Resp. at 21–22. The Garrett-Fellman Parties reply that a plain reading of Count V demonstrates that it is a claim for fraudulent concealment and cannot be re-imagined as a claim for actual fraud. GFP's Reply at 5.

The "doctrine of fraudulent concealment" tolls the running of a statute of limitations when the defendant has prevented the plaintiff from timely discovering the breach of a duty, and requires a plaintiff to show: "(1) the use of fraudulent means by the party who raises the ban of the statute [of limitations]; (2) successful

concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action." Fulghum v. Embarq Corp., 785 F.3d 395, 414 (10th Cir. 2015); Mallow v. Ethicon, Inc., No. CIV-20-01172-PRW, 2022 WL 844196, at *5 n.36 (W.D. Okla. Mar. 21, 2022) ("fraudulent concealment . . . tolls the statute of limitations until a plaintiff knew or should have known that they might have a cause of action"); AG Equip. Co. v. AIG Life Ins. Co., No. 07-CV-0556CVEPJC, 2008 WL 4570319, at *3 (N.D. Okla. Oct. 10, 2008) (holding that a life insurance company's fraudulent concealment claim against an insured was dismissed because such a claim is typically raised in response to a statute of limitations defense and a statute of limitations defense had not been raised).

Based on the allegations set out in Count V, the Court observes that this claim is not one for actual fraud under 15 Okla. Stat. Ann. § 58, but rather a claim for fraudulent concealment.  Plaintiff has already raised a claim for fraud in Count IV, which alleges a claim for fraudulent inducement, and such claim contains "all the elements of common law fraud." Oak Tree Partners, 458 P.3d at 646.  Because Count V is not being raised as a defense to a statute of limitations, the Court grants summary judgment in favor of the Garrett-Fellman Parties and dismisses Count V as not actionable.

### H. Unfair Competition and False Designation of Origin (Count VI)

Count VI alleges that Defendants infringed the trade names of "Technology Solutions Consulting" and "Imminent Data" under Section 1125(a) of the Lanham Act, and have intentionally used and are continuing to use, or authorize use of such names in commerce and in connection with goods or services.  Compl. ¶¶ 120–26.

The Garrett-Fellman Parties move for summary judgment, arguing that (1) Count VI fails because it hinges on the viability of Counts I and II, which fail as a matter of law; (2) the trade names "Technology Solutions Consulting" and "Imminent Data" are not inherently distinctive and thus require a showing of secondary meaning for which Plaintiff has not provided any evidence; and (3) Plaintiff has not identified any admissible evidence regarding activities in interstate commerce.  GFP's Moving Br. at 21–22.

The Shoemaker Parties contend that (1) Defendants' selling of the trade names to Plaintiff, as well as all similarities and derivatives thereof, was a tacit admission that these trade names are inherently distinctive; and (2) there is evidence that Defendants have used "Technology Solutions" in interstate commerce by providing services to and invoicing a company located in Arkansas.  SP's Resp. at 22–24.

The Garrett-Fellman Parties reply that (1) Plaintiff fails to demonstrate through witness testimony that it suffered commercial or reputational injury and

that such an injury was proximately caused by Defendants; (2) Defendants' selling of the trade names to Plaintiff is not an acknowledgment of the distinctive nature of the trade names; and (3) Plaintiff has not identified any admissible evidence regarding activities in interstate commerce.  GFP's Reply at 5–7.

The Lanham Act provides trademark protection for unregistered trademarks under § 43(a).  See 15 U.S.C. § 1125(a).  To support a claim under § 43(a) for an unregistered mark, the plaintiff must prove: (1) "[the] identifying mark . . . is inherently distinctive or . . . has acquired distinctiveness through secondary meaning," (2) the mark is nonfunctional, and (3) the competitor's alleged violation of the plaintiff's rights in its mark is likely to cause consumer confusion.  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992); see Savant Homes, Inc. v. Collins, 809 F.3d 1133, 1147 (10th Cir. 2016).  In the Tenth Circuit, the likelihood of confusion is a question of fact but is amenable to summary judgment in appropriate cases.  Sally Beauty Co. v. Beautyco, Inc., 304 F.3d 964, 972 (10th Cir. 2002).

Proving the first element is often the greatest hurdle, and the Parties disagree over whether this element is met.

A mark is "inherently distinctive if its intrinsic nature serves to identify a particular source.  Such [marks] almost automatically tell a customer that they refer to a brand and immediately signal a brand or a product source." Id. at 977

(citations and internal quotation marks omitted).  If the mark is not inherently distinctive, it can gain protection only after "it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself."  Wal–Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 211 (2000) (brackets and internal quotation marks omitted).  Courts have generally adopted the framework set forth in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4 (2d Cir. 1976), which separates word marks into five categories to assist in determining whether a mark is inherently distinctive: (1) fanciful, (2) arbitrary, (3) suggestive, (4) descriptive, or (5) generic.  Forney Indus., Inc. v. Daco of Missouri, Inc., 835 F.3d 1238, 1245 (10th Cir. 2016).

Pertinent caselaw provides examples of these five categories: (1) "Kodak" is an example of a "fanciful" mark because it was "invented solely for [its] use as [a] trademark[ ]"; (2) "Camel" cigarettes is an example of an "arbitrary" mark because it is a "common word . . . applied in an unfamiliar way"; (3) "Tide" laundry detergent might be said to be "suggestive" because even though it relates to the type of product at issue, "it requires imagination, thought and perception to reach a conclusion as to the nature of goods"; (4) "Tasty" bread and "Georgia" peaches are examples of "descriptive" marks because they "forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods"; and (5) words like

"spoon" when used in connection with a spoon or "bowl" when used in connection with a bowl are "generic" because they "refer . . . to the genus of which the particular product is a species." Abercrombie & Fitch Co., 537 F.2d at 11; Wal-Mart Stores, Inc., 529 U.S. at 213.  Fanciful, arbitrary, and suggestive marks are deemed inherently distinctive and are entitled to protection "because their intrinsic nature serves to identify a particular source of a product." Two Pesos, 505 U.S. at 768.  "Descriptive" marks are not inherently distinctive, and therefore require proof of secondary meaning to be protected, whereas generic marks are not protectable under the Lanham Act. Id. at 768–69.

While the trade names at issue seem to fall under the "descriptive" mark category, proof of secondary meaning occurs when "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." Wal–Mart Stores, Inc., 529 U.S. at 211.  The Shoemaker Parties do not cite evidence that would permit a fact finder to determine that the trade names are inherently distinctive or have acquired secondary meaning. Defendants' selling of the trade names to Plaintiff is not an acknowledgment of the distinctive nature of the trade names.  Because the first element is not met, the Court need not address whether there is admissible evidence pertaining to activities in interstate commerce or reputational or commercial injury caused proximately by

Defendants.  The Court grants summary judgment on Count VI in favor of the
Garrett-Fellman Parties.

## I.   Unfair Competition, Common Law Trademark Infringement, Passing Off (Count VII)

Count VII alleges that by using or permitting the use of Plaintiff's trade
names without authorization, Defendants have created confusion as to the source
of Defendants' goods or services and have traded on the reputation and goodwill of
Plaintiff.  Compl. ¶¶ 127–30.

The Garrett-Fellman Parties contend that because Plaintiff fails to offer
evidence in support of its claim for violation of the Lanham Act in Count VI, the
claim under common law in Count VII also fails, and Plaintiff fails to offer
customer testimony to demonstrate alleged likelihood of confusion.  GFP's
Moving Br. at 23; GFP's Reply at 7.  The Shoemaker Parties argue that under the
common law claim, there is evidence to show a protectable interest in the trade
names, Defendants' use of the trade names, and the likelihood of customer
confusion.  SP's Resp. at 24–25.

Because Plaintiff bases its common law unfair competition claim on the
same facts that it bases its Lanham Act claim on, the Court addresses the common
law claim together with the Lanham Act claim.

The Oklahoma Deceptive Trade Practices Act's prohibition against "passing
off" requires the same standards of proof as actions under the Lanham Act

proscribing unfair competitive practices involving potential or actual deception. Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513 (10th Cir. 1987). To prevail on the common law claim, Plaintiff must show that (1) the mark is protectable, (2) the defendant used the trademark in connection with any goods or services, and (3) the defendant's use "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." Est. of Norman v. Lavern, No. CIV-14-01435-M, 2015 WL 2414565, at *2 (W.D. Okla. May 20, 2015) (citation omitted).

Because Plaintiff fails to cite evidence that would permit a fact finder to determine that the trade names are inherently distinctive or have acquired secondary meaning, the Court grants summary judgment in favor the Garrett-Fellman Parties on Count VI under the Lanham Act, and also grants summary judgment in favor of the Garrett-Fellman Parties on Count VII under the common law unfair competition claim.

### J. Civil Conspiracy (Count VIII)

Count VIII alleges that, "Defendants entered into an illicit agreement and conspiracy to, inter alia, fraudulently inflate the value of the Businesses, to fraudulently redirect the Businesses' mail to the Fraudulent Address, to submit fraudulent invoices to Plaintiff's customers, and to fraudulently divert funds

belonging to Plaintiff," and as a "proximate result of Defendants' illicit agreement and conspiracy, Plaintiff has suffered damages in an amount to be proved at trial." Compl. ¶¶ 133–35.

The Garrett-Fellman Parties contend that Plaintiff has provided no witnesses or evidence to support its allegation that Defendants conspired to accomplish unlawful acts and has not made a showing of damages.  GFP's Moving Br. at 25–26; GFP's Reply at 23–24.  The Shoemaker Parties assert that they have evidence to support their claim, mainly pointing to the statements made in the Declaration of M. Jerome Garrett and the Declaration of Joshua S. Fellman.  SP's Resp. at 25–27; see Fellman Decl.; Garrett Decl.

Actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  Schovanec v. Archdiocese of Okla. City, 2008 OK 70, ¶ 46, 188 P.3d 158, 175.  The essential elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.  Id.  "The agreement is a matter of inference from the facts and circumstances of the alleged conspirators.  The question is whether the circumstances, considered as a whole, show that the parties united to accomplish

the fraudulent scheme." <u>N. Tex. Prod. Credit Ass'n v. McCurtain Cnty. Nat'l Bank</u>, 222 F.3d 800, 815 (10th Cir. 2000) (internal quotation marks omitted*).

Because genuine issues of material fact exist, the Court denies summary judgment as to Count VIII.

### K. Constructive Trust (Count X)

Count X seeks a constructive trust over the receivables and payments that Defendants allegedly have acquired wrongfully and fraudulently, which allegedly belong to Plaintiff, and seeks the transfer of Defendants' interest in the receivables or funds to Plaintiff.  Compl. ¶¶ 141–43.

The Garrett-Fellman Parties argue that this claim for the imposition of a constructive trust is dependent upon the viability of Plaintiff's claim of breach of the APSA, which fails due to the lack of admissible evidence.  GFP's Moving Br. at 24.  The Shoemaker Parties contend that this claim is dependent on the viability of Plaintiff's claim of fraud/concealment in Count V.  SP's Resp. at 26–27.  The Garrett-Fellman Parties state that there is no evidence to support the link between Count X and Count V, and assert that Plaintiff lacks admissible evidence on both of its claims for breach of the APSA and fraud/concealment.  GFP's Reply at 9.

A constructive trust is a legal fiction, "an equitable remedy devised to prevent unjust enrichment and compel restitution of property that in equity and good conscience does not belong to the [d]efendant," <u>In re Amdura Corp.</u>, 75 F.3d

1447, 1451–52 (10th Cir. 1996) (internal quotation marks omitted), and is a proper remedy when a recipient acquired property by defrauding the claimant. See Tenneco Oil Co. v. Joiner, 696 F.2d 768, 776 (10th Cir. 1982) (applying Oklahoma law).  Oklahoma recognizes that a constructive trust is an equitable device, with the primary purpose to avoid unjust enrichment.  Easterling v. Ferris, 1982 OK 99, ¶ 10, 651 P.2d 677, 680.  When a constructive trust would not serve to prevent unjust enrichment, and would instead deliver inequitable results, declining to impose one is not inconsistent with Oklahoma law.  United States v. Andrews, 530 F.3d 1232, 1238 (10th Cir. 2008).

Because Count X is dependent on Count V, and the Court is dismissing Count V because it is not being raised as a defense to a statute of limitations, the Court grants summary judgment in favor of the Garrett-Fellman Parties on Count X.

### L.  Accounting (Count XI)

Count XI alleges that "Defendants have wrongfully diverted or otherwise acquired payments for their personal benefit and gain that were directed or intended for Plaintiff," and "Plaintiff cannot ascertain the amounts wrongfully diverted or acquired by Defendants without a full accounting of all transactions and contracts entered into and all payments received."  Compl. ¶¶ 145–46.

The Garrett-Fellman Parties move for summary judgment, stating that Plaintiff did not request any financial statements, tax returns, or other financial statements from Defendants that can be considered in an accounting analysis, and with discovery having closed on September 28, 2020, Plaintiff is precluded from obtaining any admissible evidence regarding Defendants' financial position. GFP's Moving Br. at 24–25.  The Shoemaker Parties assert that "Plaintiff's early requests for judicial intervention [through a motion for preliminary injunction] are still pending before the Court, and as such the initial purpose of the Accounting requested in Plaintiff's Complaint has been marginalized by the passage of time," but "an order of Accounting is still a viable form of relief to which [P]laintiff is entitled."  SP's Resp. at 27.  The Garrett-Fellman Parties assert that Plaintiff has abandoned this claim based on its response brief.  GFP's Reply at 9.

Under Oklahoma law, accounting is an equitable remedy.  Hitch Enter., Inc. v. Cimarex Energy Co., 859 F. Supp. 2d 1249, 1258 (W.D. Okla. 2012).  A remedy is appropriate under two circumstances: "(1) plaintiffs have a demonstrated right to some recovery, but no adequate remedy at law without the court utilizing its equity power to order an accounting; or (2) a fiduciary or trust relationship existed, and the complicated character of the accounts and the need for drawn-out proceedings rendered the matter unsuitable for a jury determination."  Margaret Blair Tr. v. Blair, 2016 OK CIV APP 47, ¶ 25, 378 P.3d 65, 74.

68

Because the Court holds that Plaintiff's Motion for Preliminary Injunction is denied as moot, and Plaintiff does not need a court order for accounting to receive relief at this stage of the litigation, the Court grants summary judgment in favor of the Garrett-Fellman Parties on Count XI.

In summary, the Court grants summary judgment in favor of the Garrett-Fellman Parties on the claims of fraudulent inducement (Count IV), fraud/concealment (Count V), unfair competition and false designation of origin under the Lanham Act (Count VI), unfair competition, common law trademark infringement, and passing off, under Oklahoma law (Count VII), constructive trust (Count X), and accounting (Count XI).  Summary judgment is denied as to the following claims and counterclaims: breach of the APSA (Count I), breach of the Restrictive Covenant Agreement (Count II), tortious interference with existing and prospective contractual relations (Count III), civil conspiracy (Count VIII), breach of the Consulting Agreement Summary (Counterclaim I), conversion (Counterclaim II), and breach of guaranty (Counterclaim III).

## CONCLUSION

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

(1) Plaintiff's Motion for Preliminary Injunction [Doc. 16] is denied as moot.

(2)  Shoemaker's Motion to Dismiss [Doc. 57] and Plaintiff's Motion to Dismiss [Doc. 59] are denied pursuant to Rule 12(b)(1) and denied in

part and granted in part pursuant to Rule 12(b)(6).  The following

counterclaims are dismissed: conversion (Counterclaim II), tortious

interference with existing business relationships (Counterclaim IV),

appointment of a receiver and the imposition of a constructive trust

(Counterclaim V), appointment of a receiver and the imposition of a

constructive trust (Counterclaim VI), and accounting (Counterclaim VII).

(3) The Garrett-Fellman Parties' Motion for Partial Summary Judgment

[Doc. 82] is denied in part and granted in part.  Summary judgment is

denied as to the following claims: breach of the APSA (Count I), breach

of the Restrictive Covenant Agreement (Count II), conversion

(Counterclaim II), tortious interference with existing and prospective

contractual relations (Count III), and civil conspiracy (Count VIII).

Summary judgment is granted in favor of the Garrett-Fellman Parties as

to the following claims: fraudulent inducement (Count IV),

fraud/concealment (Count V), unfair competition and false designation of

origin under the Lanham Act (Count VI), unfair competition, common

law trademark infringement, and passing off, under Oklahoma law

(Count VII), constructive trust (Count X), and accounting (Count XI).

(4) The Shoemaker Parties' Motion for Partial Summary Judgment [Doc.

94] is denied.  Summary judgment is denied as to the claims of breach of

the APSA (Count I), breach of the Restrictive Covenant Agreement (Count II), breach of the Consulting Agreement Summary (Counterclaim I), and breach of guaranty (Counterclaim III).

(5) The Parties shall confer and schedule mediation dates with a private mediator.  The Parties shall submit joint status reports to the Court on December 18, 2023 and January 16, 2024 advising of the status of mediation.  If a settlement is not reached by January 16, 2024, the Court will schedule a trial date in the Northern District of Oklahoma.

IT IS SO ORDERED this 1st day of December, 2023.

       /s/ Jennifer Choe-Groves
       Jennifer Choe-Groves
       U.S. District Court Judge[*]

---

[*] Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.